IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

MAR 1 2 2009

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:09cr |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 371 (conspiracy to |
| | ) | evade securities registration |
| PHILLIP WINDOM OFFILL, JR., | ) | violations; securities fraud and wire |
| | ) | fraud) |
| Defendant. | ) | |
| | ) | Counts 2-10: 18 U.S.C. § 1343 (wire fraud) |
| | ) | |
| | ) | Forfeiture Notice |

MARCH 2009 TERM – AT ALEXANDRIA, VIRGINIA

INDICTMENT

COUNT 1

(Conspiracy to Commit Securities Registration Violations,
Securities Fraud, and Wire Fraud)

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment:

Defendant

1.      The defendant, PHILLIP WINDOM OFFILL, JR., resided in Texas and was

licensed to practice law in Texas and Oklahoma.  OFFILL was formerly an attorney with the

United States Securities and Exchange Commission, and was a partner at a private law firm in

Dallas, Texas, with an emphasis on securities law.  OFFILL represented attorney David B.

Stocker and advised Stocker and others on stock issuances which are the subject of this

Indictment.  OFFILL also fraudulently participated in some of the stock issuances described in

this Indictment by acting through various shell companies as a purported investor.

## Relevant Individuals

2.      David B. Stocker was a securities attorney licensed to practice in Arizona and practiced law under his firm's name, David B. Stocker, Ltd.  Stocker specialized in securities and corporate law, to include helping small companies raise funds through stock issuances.  Stocker acted as securities counsel for the issuers identified in this Indictment.

3.      Gregory A. Neu resided in Florida, and was the Chief Executive Officer of eDollars, Inc., purportedly an Internet payday loan company.  Neu helped form Emerging Holdings, Inc., MassClick, Inc., and China Score, Inc.

4.      Stephen P. Luscko resided in Florida, and was the President of eDollars, Inc., a company he founded with Neu.  Luscko also helped form Emerging Holdings, MassClick, and China Score.

5.      Justin Medlin, also known as "The Kid," a resident of Paris, France, operated a "spam" email business that provided electronic marketing on behalf of Emerging Holdings, MassClick, and China Score.

6.      Co-conspirator 1 ("CC1), a resident of Reston, Virginia, was the president of Emerging Holdings.

7.      Brian A. Brunette was a resident of Florida and was the president of MassClick.

8.      Co-Conspirator 2 ("CC2"), a resident of New York, New York, acted as an accredited investor in MassClick.

9.      Co-conspirator 3 ("CC3"), a resident of Oklahoma City, Oklahoma, was a securities broker with Legacy Trading Company LLC brokerage firm in Edmond, Oklahoma.

10.     Co-conspirator 4 ("CC4"), a resident of Duxbury, Massachusetts, acted as an accredited investor in China Score.

Relevant Corporate Issuers

11.     Emerging Holdings, Inc., was incorporated by Stocker on or about July 1, 2004, in the State of Nevada, and its headquarters was located at CC1's parents' house in Reston, Virginia. Emerging Holdings purported to be in the business of data encryption, web access management, and developer solutions. CC1 was the sole officer and director of MassClick. In or about July 2004, the company retained Stocker as its securities counsel for purposes of conducting a public stock issuance.

12.     MassClick, Inc., was incorporated by Stocker on or about July 23, 2004, in the State of Nevada. MassClick purported to be an Internet marketing company that brokered the sale of goods and services online. Brian Brunette was the sole officer and director of MassClick. In or about July 2004, the company retained Stocker as its securities counsel for purposes of conducting a public stock issuance.

13.     China Score, Inc., was incorporated by Stocker on or about July 29, 2004, in the State of Nevada. China Score purported to be in the business of providing a credit scoring system and associated financial data reporting services in China. In or about July 2004, the company retained Stocker as its securities counsel for purposes of conducting a public stock issuance.

14.     Ecogate, Inc.'s predecessor was incorporated in the State of California, which amended its name to Ecogate in or about April 1999. In or about April 2004, Ecogate retained Stocker as its securities counsel for purposes of conducting a public stock issuance. Ecogate

3

purported to be in the business of selling an on-demand energy-saving dust/mist/fume collecting and industrial ventilation system.

15.     Media International Concepts, Inc., was incorporated on or about March 29, 2004, in the State of Nevada. Media International Concepts purported to be in the business of television and film production and distribution. In or about May 2004, the company retained Stocker as its securities counsel for purposes of conducting a public stock issuance.

16.     Vanquish Productions LLC was formed in the State of Texas in or about May 2004. Vanquish Productions purported to be in the business of developing and distributing recorded music and television programming. In or about May 2004, the company retained Stocker as its securities counsel for purposes of conducting a public stock issuance.

17.     Auction Mills, Inc., was incorporated on or about May 19, 2004, in the State of Texas. Auction Mills purported to be in the business of providing a consignment service for sales of items on eBay. In or about May 2004, the company retained Stocker as its securities counsel for purposes of conducting a public stock issuance.

18.     AVL Global, Inc., was incorporated on or about April 8, 2004, in the State of Nevada. AVL Global purported to be in the business of real estate construction. In or about April 2004, the company retained Stocker as its securities counsel for purposes of conducting public stock issuances.

19.     Custom Designed Compressor Systems, Inc., was incorporated on or about June 15, 2004, in the State of Delaware. Custom Designed Compressor Systems purported to be in the business of leasing and integration of oil and gas equipment. In or about June 2004, the

4

company retained Stocker as its securities counsel for purposes of conducting a public stock issuance.

## Texas Accredited Investor Shell Companies

20.     Steep Blue Holdings, Inc., was incorporated on or about June 3, 2004, in the State of Texas by OFFILL, and he was the sole officer and director of the entity.  OFFILL listed his law firm's address as the address for Steep Blue Holdings.

21.     Collective Thought Holdings, Inc., was incorporated on or about July 20, 2004, in the State of Texas by OFFILL, and he was the sole officer and director of the entity.  OFFILL listed his law firm's address as the address for Collective Thought Holdings.

22.     TGWSS Ventures LLC was formed on or about February 19, 2004, in the State of Texas, and OFFILL was the sole manager of the entity.  OFFILL listed his law firm's address as the address for TGWSS Ventures.

23.     Odyssey Contracting LLC was organized by OFFILL on or about November 30, 2000, in the States of Texas.  In or about March 2004, OFFILL revived the limited liability company and established himself as the sole manager of the entity.  OFFILL listed his law firm's address as the address for Odyssey Contracting.

24.     Classical Movement Holdings, Inc., was incorporated on or about July 20, 2004, in the State of Texas by OFFILL.  OFFILL was the sole officer and director of the entity.  OFFILL listed his law firm's address as the address for Classical Movement Holdings.

25.     Crimson City Holdings, Inc., was incorporated on or about June 3, 2004, in the State of Texas by OFFILL.  OFFILL was the sole officer and director of the entity.  OFFILL listed his law firm's address as the address for Crimson City Holdings.

5

### Additional Entities and Terms

26.     Curtis-Case, Inc., was incorporated on or about September 25, 1998, in the State of Colorado by Stocker.  Stocker was the sole officer and director of Curtis-Case, and he used the corporate entity to hold investments.

27.     ACAP Partners II, LP, was formed on or about May 12, 2004, by OFFILL as a limited partnership with a general partner of PACA Partners, Inc., a Texas corporation for whom OFFILL served as president.  OFFILL formed the limited partnership for a co-conspirator and acted as the nominee for it.

28.     The Over-the-Counter ("OTC") securities market was the equity market for securities not listed on a United States stock exchange or the NASDAQ Stock Market.  The OTC market was linked by computer networks, and quotations for OTC securities may have been quoted on listing services such as Pink Sheets.

29.     The Pink Sheets was an inter-dealer electronic quotation and trading system in the OTC securities market.

30.     The Securities and Exchange Commission ("SEC") was an independent agency of the United States charged with enforcing the federal securities laws.  The SEC regulated, among other areas, the offers and sales of securities.  In order for a company to offer or sell its securities to the public, federal securities laws, specifically § 5 of the Securities Act of 1933, required that the company first file a registration statement with the SEC or that the transaction be exempt from registration.  The requirement of a registration statement was designed, in part, to protect the general investing public by requiring detailed disclosures about a company's actual operations and financial condition.

6

31.     An "underwriter" was a person who took shares from a company with a view to offer or sell the shares, directly or indirectly, in connection with a distribution of the company's securities. A share issuance involving an underwriter required the filing of a registration statement.

32.     Rule 504 of Regulation D, 17 C.F.R. § 230.501 *et seq.* (1999) ("Rule 504"), exempted from the registration requirements limited offers and sales of securities that did not exceed $1,000,000 if, among other things, the offers and sales were made in compliance with a state law exemption from registration and were sold only to "accredited investors." Rule 504 did not exempt from registration share issuances involving underwriters and schemes designed to cause the distribution of shares to the general investing public.

33.     Texas Administrative Code § 139.19 ("TAC § 139.19") provided an exemption from registration under Texas law for offers or sales of securities to an accredited investor entity if the entity purchased shares for investment and not with a view to or for sale in connection with a distribution of the security. Any resale of the security within twelve months was presumed to be with a view to distribution, not for investment, unless sold to another accredited investor pursuant to a valid exemption under Texas securities law.

## THE CONSPIRACY

34.     From in or about March 2004 through in or about October 2004, in the Eastern District of Virginia and elsewhere, the defendant, PHILLIP WINDOM OFFILL, JR., did knowingly and willfully combine, conspire, confederate, and agree with David Stocker and others known and unknown to the Grand Jury to commit certain offenses against the United States, namely,

7

a. securities registration violations, including:

i. where no registration statement was in effect as to a security, to willfully make use of, directly and indirectly, any means and instruments of transportation and communication in interstate commerce and of the mails to sell such security through the use and medium of any prospectus and otherwise, in violation of Title 15, United States Code, §§ 77e(a)(1) and 77x;

ii. where no registration statement was in effect as to a security, to willfully carry and cause to be carried, directly and indirectly, through the mails and in interstate commerce, by any means and instruments of transportation, any such security for the purpose of sale and for delivery after sale, in violation of Title 15, United States Code, §§ 77e(a)(2) and 77x;

iii. to willfully make use of, directly and indirectly, any means and instruments of transportation and communication in interstate commerce and of the mails to offer to sell and offer to buy through the use and medium of any prospectus and otherwise any security, unless a registration statement has been filed as to such security, in violation of Title 15, United States Code, §§ 77e(c) and 77x.

b. securities fraud, that is, by the use of the means and instrumentalities of interstate commerce and the mails, directly and indirectly, to willfully employ manipulative and deceptive devices and contrivances in violation of 17 C.F.R. § 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices,

8

and courses of business which operated and would operate as a fraud and deceit upon a person in connection with the purchase and sale of securities, all in violation of 15 U.S.C. §§ 78j(b) and 78ff.

          c.      wire fraud, that is, having devised a scheme and artifice to defraud and obtain money and property from investors in the Issuers' common stock by means of materially false and fraudulent pretenses, representations, and promises, to knowingly and willfully use interstate wires for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, § 1343.

OBJECTS OF THE CONSPIRACY

     35.     Among the objects of the conspiracy were:

          a.      to unjustly enrich the conspirators, through fees and the sale of securities to the general investing public, by fraudulently selling unregistered shares of the Issuers' common stock; and

          b.      to unjustly enrich the conspirators, through fees and the sale of securities to the general investing public, by artificially inflating the market prices of and demand for the common stock of Emerging Holdings, MassClick, and China Score.

MANNER AND MEANS OF THE CONSPIRACY

     36.     Among the manner and means by which defendant OFFILL, Stocker, and others known and unknown to the Grand Jury, would and did carry out the conspiracy included, but were not limited to, the following:

          a.      OFFILL and Stocker devised a method to evade federal securities registration requirements in order to hide from the general investing public the actual financial

9

condition and business operations, or lack thereof, of the Issuers and in order to provide co-conspirators with millions of unregistered and unrestricted, i.e., "free-trading," shares of Issuers' common stock, which the co-conspirators could not legally obtain directly from the Issuers, for sale to the general investing public.

b.     Stocker and other co-conspirators identified individuals who sought to raise money in public capital markets, assisted them with the incorporation of the Issuers, to the extent necessary, and prepared the necessary documentation to enable the Issuers to issue common stock.

c.     OFFILL, Stocker, and other co-conspirators engaged in sham transactions between the Issuers and, among others, shell companies controlled by OFFILL that were designed to give the appearance that the shell companies were purchasing Issuers' common stock for investment purposes and not with a view toward distribution.

d.     OFFILL and Stocker reviewed, produced, and/or signed false and fraudulent subscription agreements, legal opinion letters, and other corporate documents to give the false appearance that the purported sales of shares by the Issuers to accredited investors complied with federal and Texas securities exemptions from registration requirements, including Rule 504 and TAC § 139.19, and to disguise their roles as underwriters.

e.     Co-conspirators, including OFFILL, used nominees and shell companies to disguise their true roles and participation in the conspiracy.

f.     OFFILL and Stocker deceived transfer agents, causing them to issue to co-conspirators unrestricted stock certificates without restrictive trading legends so that the shares could be sold to the general investing public in the OTC market through listings on Pink Sheets.

10

g.    Despite OFFILL representing in documents that his entities were purchasing Issuers' common stock for investment purposes, he, Stocker, and other co-conspirators caused the shares to be transferred, within days of the initial issuances to the OFFILL-controlled entities, to co-conspirators so that the co-conspirators could sell the shares to the general investing public in the OTC market through listings on Pink Sheets, all without a registration statement being filed with the SEC contrary to § 5 of the Securities Act of 1933.

h.    With regard to Emerging Holdings, MassClick, and China Score, OFFILL and other co-conspirators facilitated the evasion of the federal registration requirements and the issuance of free-trading stock to co-conspirators in connection with a plan to artificially manipulate the market price and demand for the stock and then sell the shares at inflated values.

i.    Co-conspirators engaged in actions to "pump," or artificially manipulate, the market price and demand for their shares of Emerging Holdings, MassClick, and China Score common stock by coordinating trades to create the appearance of market interest and causing the release of false and misleading information through spam email campaigns, press releases, websites, and other outlets.

j.    Co-conspirators, including OFFILL, facilitated the "dumping," or selling, of shares of Emerging Holdings, MassClick, and China Score common stock after the pump phase of the conspiracy had begun, earning large illegal profits for co-conspirators.

k.    OFFILL concealed his profits from the scheme by billing co-conspirators legal fees for his participation in the conspiracy, including a $2,500 payment per transaction in which an OFFILL-controlled entity purported to purchase common stock from an Issuer.

11

l.      OFFILL used his law firm's client trust account to receive and conceal payments to him by co-conspirators and to launder proceeds of the conspiracy for a co-conspirator.

## OVERT ACTS

37.     In furtherance of the aforementioned conspiracy and to effect the objects thereof, defendant OFFILL and others known and unknown to the Grand Jury performed the following overt acts in the Eastern District of Virginia and elsewhere:

### *Emerging Holdings*

a.      On or about July 1, 2004, Stocker sent by facsimile to CC1 in Reston, Virginia, the incorporation paperwork for Emerging Holdings for CC1's signature.

b.      On or about July 1, 2004, Stocker filed the incorporation paperwork for Emerging Holdings in the State of Nevada.

c.      On or about July 2, 2004, Stocker emailed to Luscko the CUSIP number assigned by Standard and Poor's for purposes of obtaining a trading symbol for Emerging Holdings.

d.      On or about July 6, 2004, CC1, located in Reston, Virginia, signed a subscription agreement on behalf of Emerging Holdings purporting to sell for investment purposes 10,000,000 shares of Emerging Holdings common stock to Steep Blue Holdings, an OFFILL-controlled entity, for $100,000.

e.      On or about July 7, 2004, Stocker issued an opinion letter opining that the sale of 10,000,000 shares of Emerging Holdings common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

12

f.      On or about July 7, 2004, Stocker provided Holladay Stock Transfer Agency with a copy of, among other documents, the opinion letter and subscription agreement, instructing Holladay to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Steep Blue Holdings for 10,000,000 shares of Emerging Holdings common stock.

g.      On or about July 7, 2004, OFFILL provided Stocker with a signed, blank stock power form for the Emerging Holding shares.

h.      On or about July 7, 2004, OFFILL signed a written consent on behalf of Steep Blue Holdings authorizing the transfer of the 10,000,000 shares of Emerging Holdings stock it held.

i.      On or about July 7, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel Steep Blue Holdings stock certificate and transfer the shares in the following way: a share certificate for 9,600,000 shares to Neu/Luscko; a share certificate for 400,000 shares to Curtis-Case, an entity controlled by Stocker; and a share certificate for 50,000 shares to ACAP Partners II.

j.      On or about July 7, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm's trust account as payment for OFFILL's role in the Emerging Holdings stock issuance.

k.      On or about July 9, 2004, CC3 submitted to Pink Sheets an unsolicited quote entry form for Emerging Holdings to quote its stock on Pink Sheets.

l.      On or about July 9, 2004, CC1, from Reston, Virginia, and other co-conspirators caused PR Newswire to issue a press release announcing, among other information, that Emerging Holdings would commence an "initial public offering" on July 12, 2004.

13

m.    On or about July 10, 2004, Neu, Luscko, and Justin Medlin caused the launch of a spam email campaign sent through, among others, America Online servers in the Eastern District of Virginia, containing the following false and misleading statements:

i.    stock projections of an opening-day target price of $2.50, a five-day target of $3.25, a ten-day target of $5.65, and a three-month target of $15.00; and

ii.    Emerging Holdings was "engaged in HIGH technology (internet and encryption products) in STRICTLY emerging markets—namely the Middle East and China" when in fact Emerging Holdings had no actual operations.

n.    On or about July 12, 2004, Curtis-Case sold 75,000 unregistered shares of Emerging Holdings common stock on the OTC market through Pink Sheets listings.

o.    On or about July 12, 2004, ACAP Partners II sold 50,000 unregistered shares of Emerging Holdings common stock on the OTC market through Pink Sheets listings.

p.    On or about July 15, 2004, CC1 sent an email from Reston, Virginia, to Luscko containing wiring information for the Emerging Holdings bank account in Reston, Virginia.

q.    On or about July 20, 2004, CC1 sent an email from Reston, Virginia, to Neu and Luscko with an attached draft press release for Emerging Holdings.

r.    On or about July 20, 2004, CC1 sent an email from Reston, Virginia, to Neu describing a visit to Emerging Holdings by Senior Investigator Danny Taylor of the Virginia State Corporation Commission, Division of Securities and Retail Franchising.

14

s.      On or about July 22, 2004, CC1 sent an email from Reston, Virginia, to Stocker inquiring what he should do in response to contact by the Virginia State Corporation Commission, Division of Securities and Retail Franchising.

t.      On or about July 22, 2004, Neu sent a facsimile to CC1 in Reston, Virginia, containing a promissory note dated June 11, 2004, memorializing Neu and Luscko's agreement to pay Emerging Holdings $1 million or to return the shares of common stock they held.

u.      On or about July 22, 2004, OFFILL caused approximately $88,000 in proceeds from the sale of unregistered Emerging Holdings common stock to be wire transferred from the ACAP Partners II brokerage account to the client trust bank account for his law firm.

v.      On or about July 22, 2004, Neu and Luscko caused approximately $2,430,000 in proceeds from the sale of unregistered Emerging Holdings common stock to be wire transferred to a bank account in Sarasota, Florida, controlled by Luscko.

w.      On or about July 22, 2004, Neu and Luscko caused approximately $1,000,000 in proceeds from the sale of unregistered Emerging Holdings common stock to be wire transferred to the Emerging Holdings bank account at Bank of America in Reston, Virginia.

x.      On or about July 23, 2004, CC1 sent by facsimile from Reston, Virginia, a letter to Neu and Luscko stating that the financial obligations in the June 11, 2004, promissory note had been fulfilled.

y.      On or about August 6, 2004, Stocker sent a 21-page facsimile to Danny Taylor of the Virginia Division of Securities in Richmond, Virginia, containing, among other

15

items, a copy of the subscription agreement signed by CC1 on behalf of Emerging Holdings and OFFILL on behalf of Steep Blue Holdings.

*MassClick*

      z.     On or about July 23, 2004, Stocker filed incorporation paperwork for MassClick in the State of Nevada.

      aa.     On or about July 23, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm's trust account as payment for OFFILL's role in the MassClick stock issuance.

      bb.     On or about July 25, 2004, CC2 endorsed a promissory note to pay MassClick $1,000,000 by January 15, 2005, or return the common stock transferred to him.

      cc.     On or about July 26, 2004, Stocker obtained a CUSIP number from Standard and Poor's for purposes of obtaining a trading symbol for MassClick.

      dd.     On or about July 26, 2004, Stocker issued an opinion letter opining that that the sale of 10,000,000 shares of MassClick common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

      ee.     On or about July 26, 2004, OFFILL signed a subscription agreement on behalf of Classical Movement Holdings purporting to memorialize the purchase for investment purposes of 10,000,000 shares of MassClick common stock by Classical Movement Holdings for $100,000.

      ff.     On or about July 26, 2004, OFFILL signed a written consent on behalf of Classical Movement Holdings authorizing the transfer of the 10,000,000 shares of MassClick common stock it held.

gg.     On or about July 26, 2004, OFFILL provided Stocker with a signed, blank stock power form for the MassClick shares.

hh.     On or about July 27, 2004, Stocker provided Holladay Stock Transfer Agency with a copy of, among other documents, the opinion letter and subscription agreement, instructing Holladay to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Classical Movement Holdings for 10,000,000 shares of MassClick common stock.

ii.     On or about July 27, 2004, Stocker instructed Holladay Stock Transfer Agency to transfer Classical Movement Holdings stock in the following way: a share certificate for CC2 for 9,750,000 unrestricted shares; two separate share certificates for Curtis-Case for 100,000 unrestricted shares each; and one share certificate for ACAP Partners II for 50,000 unrestricted shares.

jj.     On or about July 29, 2004, CC3 submitted to Pink Sheets an unsolicited quote entry form for MassClick to quote its stock on Pink Sheets.

kk.     On or about July 30, 2004, CC2 deposited 9,750,000 shares of MassClick unrestricted common stock in a brokerage account at Legend Merchant Group.

ll.     On or about July 30, 2004, CC2 sold 5,000 shares of unrestricted MassClick common stock on the OTC market through Pink Sheets listings.

mm.    On or about July 31, 2004, Neu, Luscko, and Justin Medlin caused the launch of a spam email campaign sent through, among others, America Online servers in the Eastern District of Virginia, containing the following false and misleading statements:

i.     stock projections of an opening-day target price of $4.38, a five-day target of $6.12, and a one-month target of $11.42; and

17

ii.      "The company has developed a proprietary software platform to track and manage sales and advertising for ecommerce companies . . . This company has been in business for 4 years and has grown quickly, and now it's time for them to explode quickly in the public markets!!!!!" when in fact MassClick had no actual operations.

nn.      On or about August 2, 2004, ACAP Partners II sold 50,000 unregistered shares of MassClick common stock on the OTC market through Pink Sheets listings.

oo.      On or about August 2, 2004, Curtis-Case sold 60,000 unregistered shares of MassClick common stock on the OTC market through Pink Sheets listings.

pp.      On or about August 2, 2004, CC2 sold 107,300 unregistered shares of MassClick common stock on the OTC market through Pink Sheets listings.

qq.      On or about August 3, 2004, Brunette emailed Legend Merchant Group information to explain how CC2 came into possession of 9,750,000 unrestricted shares of MassClick's common stock.

rr.      On or about August 5, 2004, Stocker sent to Legend Merchant Group a legal opinion letter for MassClick that falsely and fraudulently claimed that the CC2 had obtained the shares in a valid Rule 504 transaction and that the shares had no resale restrictions.

ss.      On or about August 5, 2004, Brunette provided documents to Legend Merchant Group in response to its having halted trading in CC2's brokerage account.

tt.      On or about August 13, 2004, OFFILL and others caused approximately $94,000 in proceeds from the sale of unregistered MassClick common stock to be wire transferred from an ACAP Partners II brokerage account at Barron Moore to the client trust bank account for Offill's law firm.

18

uu.     On or about August 23, 2004, OFFILL spoke by telephone with a trader at Legend Merchant Group to discuss the tradability of CC2's shares.

vv.     On or about August 23, 2004, OFFILL caused another attorney to draft a legal opinion letter opining that there were no restrictions on the resale of CC2's MassClick common stock held at Legend Merchant Group.

ww.     On or about August 25, 2004, OFFILL instructed Luscko to pay him $25,000 for future services related to the shares held at Legend Merchant Group.

xx.     On or about September 20, 2004, CC2 directed Legend Merchant Group to transfer his shares to a brokerage account he opened at Barron Moore brokerage firm.

*China Score*

yy.     On or about July 29, 2004, Stocker filed incorporation paperwork for China Score in the State of Nevada.

zz.     On or about July 30, 2004, Stocker requested a CUSIP number for China Score from Standard and Poor's for purposes of obtaining a trading symbol.

aaa.     On or about August 5, 2004, OFFILL signed a subscription agreement on behalf of Collective Thought Holdings purporting to memorialize the purchase for investment purposes of 10,000,000 shares of China Score common stock by Collective Thought Holdings for $100,000.

bbb.     On or about August 5, 2004, Stocker issued an opinion letter opining that the sale of 10,000,000 shares of China Score common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

19

ccc.   On or about August 5, 2004, Stocker provided Holladay Stock Transfer Agency with a copy of, among other documents, the opinion letter and subscription agreement, instructing Holladay to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Collective Thought Holdings for 10,000,000 shares of China Score common stock.

ddd.   On or about August 5, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the China Score stock issuance.

eee.   On or about August 5, 2004, OFFILL signed a written consent on behalf of Collective Thought Holdings authorizing the transfer of the 10,000,000 shares of China Score common stock it held.

fff.   On or about August 5, 2004, OFFILL provided Stocker with a signed, blank stock power form for the China Score shares.

ggg.   On or about August 6, 2004, Stocker caused Holladay Stock Transfer Agency to transfer the 10,000,000 unrestricted shares of China Score common stock issued to Collective Thought Holdings to CC4.

hhh.   On or about Friday, August 27, 2004, Neu, Luscko, and others caused PR Newswire to issue a press release announcing, among other information, that China Score would commence an "initial public offering" on Monday, August 30, 2004.

iii.   On or about Saturday, August 28, 2004, Neu, Luscko, and Justin Medlin caused the launch of a spam email campaign sent through, among others, America Online servers in the Eastern District of Virginia, containing the following false and misleading statements:

i.   stock projections of an IPO price of $.75, a three-day target of $2.00, and a "longer term" target of $5.10; and

ii.      "This company is engaged in establishing the very first private credit scoring bureau for consumers in China!!!!!!!" when in fact China Score had no actual operations.

jjj.      On or about August 30, 2004, CC4 endorsed a promissory note to pay China Score $1,000,000 by January 30, 2005, or return common stock transferred to him.

kkk.      On or about September 2, 2004, CC4 sold approximately 512,635 unregistered shares of China Score common stock on the OTC market through Pink Sheets listings.

lll.      On or about September 15, 2004, CC4 sent a check for $1,000,000 in proceeds from the sale of unregistered China Score common stock payable to the president of China Score for "repayment of loan for stock issued."

mmm.  On or about September 15, 2004, CC4 sent a check for $176,094 in proceeds from the sale of unregistered China Score common stock to Lyons Inc. for the benefit of Neu and Luscko for "consulting fee, stock trades China Score Inc."

nnn.      On or about September 15, 2004, Neu caused approximately $75,000 in proceeds from the sale of unregistered China Score common stock to be wire transferred to Stocker's attorney trust account.

*Ecogate*

ooo.      On or about April 28, 2004, OFFILL signed a subscription agreement on behalf of Collective Thought Holdings purporting to memorialize the purchase for investment purposes of 750,000 shares of Ecogate common stock for $7,500.

21

ppp.   On or about April 30, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the Ecogate stock issuance.

qqq.   On or about May 5, 2004, Stocker issued an opinion letter opining that the sale of 10,000,000 shares of Ecogate common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

rrr.   On or about May 7, 2004, OFFILL provided Stocker with a signed, blank stock power form for the Ecogate shares.

sss.   On or about May 7, 2004, Stocker instructed Holladay Stock Transfer Agency to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to TGWSS Ventures for 750,000 shares of Ecogate common stock.

ttt.   On or about May 7, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel the stock certificate for TGWSS Ventures and to reissue the shares to Curtis-Case.

uuu.   On or about May 13, 2004, Curtis-Case sold approximately 38,000 unregistered shares of Ecogate common stock on the OTC market through Pink Sheets listings.

*Media International Concepts*

vvv.   On or about May 12, 2004, OFFILL signed a subscription agreement on behalf of Odyssey Contracting purporting to memorialize the purchase for investment purposes of 750,000 shares of Media International Concepts common stock for $7,500.

www.   On or about May 19, 2004, Stocker issued an opinion letter opining that the sale of 10,000,000 shares of Media International Concepts common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

xxx.   On or about May 19, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the Media International stock issuance.

yyy. On or about May 19, 2004, OFFILL provided Stocker with a signed, blank stock power form for the Media International Concepts shares.

zzz.   On or about May 19, 2004, OFFILL signed a written consent on behalf of Odyssey Contracting authorizing the transfer of the 750,000 shares of Media International Concepts stock it held.

aaaa.   On or about May 20, 2004, Stocker instructed Holladay Stock Transfer Agency to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Odyssey Contracting for 750,00 shares of Media International Concepts common stock.

bbbb.   On or about May 21, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel the stock certificate for Odyssey Contracting and to reissue the shares to Curtis-Case.

cccc. On or about May 28, 2004, Stocker caused Curtis-Case to sell approximately 250,000 unregistered shares of Media International Concepts common stock on the OTC market through Pink Sheets listings.

*Vanquish Productions*

dddd. On or about June 3, 2004, OFFILL signed a subscription agreement on behalf of Steep Blue Holdings purporting to memorialize the purchase for investment purposes of 500,000 shares of Vanquish Productions common stock for $5,000.

eeee. On or about June 4, 2004, Stocker issued an opinion letter opining that the sale of 6,100,000 shares of Vanquish Productions common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

ffff.　On or about June 4, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the Vanquish Productions stock issuance.

gggg. On or about June 7, 2004, OFFILL provided Stocker with a signed, blank stock power form for the Vanquish Productions shares.

hhhh.　On or about June 7, 2004, OFFILL signed a written consent on behalf of Steep Blue Holdings authorizing the transfer of the 500,000 shares of Vanquish Productions stock it held.

iiii.　On or about June 8, 2004, Stocker instructed Holladay Stock Transfer Agency to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Steep Blue Holdings for 500,000 shares of Vanquish Productions common stock.

jjjj.　On or about June 8, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel the stock certificate for Steep Blue Holdings and to reissue the shares to Curtis-Case.

kkkk. On or about June 14, 2004, Stocker caused Curtis-Case to sell approximately 200,000 unregistered shares of Vanquish Productions common stock on the OTC market through Pink Sheets listings.

*Auction Mills*

llll. On or about June 23, 2004, OFFILL signed a subscription agreement on behalf of Crimson City Holdings purporting to memorialize the purchase for investment purposes of 500,000 shares of Auction Mills common stock for $5,000.

mmmm. On or about June 25, 2004, Stocker issued an opinion letter opining that the sale of 5,000,000 shares of Auction Mills common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

nnnn.   On or about June 25, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the June Auction Mills stock issuance.

oooo.   On or about June 28, 2004, OFFILL provided Stocker with a signed, blank stock power form for the Auction Mills shares.

pppp.   On or about June 28, 2004, OFFILL signed a written consent on behalf of Crimson City Holdings authorizing the transfer of the 500,000 shares of Auction Mills stock it held.

qqqq.   On or about July 8, 2004, Stocker instructed Interwest Stock Transfer Co., Inc., to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Crimson City Holdings for 500,000 shares of Auction Mills common stock.

rrrr.   On or about July 13, 2004, OFFILL signed a subscription agreement on behalf of Crimson City Holdings purporting to memorialize the purchase for investment purposes of 200,000 shares of Auction Mills common stock for $2,000.

25

ssss.    On or about July 13, 2004, OFFILL provided Stocker with a signed, blank stock power form for Auction Mills shares.

tttt.    On or about July 13, 2004, OFFILL signed a written consent on behalf of Crimson City Holdings authorizing the transfer of the 200,000 shares of Auction Mills stock it held.

uuuu.    On or about July 13, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the July Auction Mills stock issuance.

vvvv.    On or about July 14, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel the stock certificate for 500,000 of Auction Mills shares for Crimson City Holdings and to reissue the shares to Curtis-Case.

wwww.    On or about July 14, 2004, Stocker issued an opinion letter opining that the sale of 200,000 shares of Auction Mills common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

xxxx.    On or about July 15, 2004, Stocker instructed Holladay Stock Transfer Agency to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Crimson City Holdings for 200,00 shares of Auction Mills common.

yyyy.    On or about July 15, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel the stock certificate for 200,000 Auction Mills shares for Crimson City Holdings and to reissue the shares to Curtis-Case.

26

zzzz.   On or about July 21, 2004, Stocker caused Curtis-Case to sell approximately 175,000 shares of Auction Mills common stock on the OTC market through Pink Sheets listings.

*AVL Global*

aaaaa.  On or about April 8, 2004, AVL Global was incorporated in the State of Nevada.

bbbbb.          On or about July 27, 2004, OFFILL signed a subscription agreement on behalf of Collective Thought Holdings purporting to memorialize the purchase for investment purposes of 5,000,000 shares of AVL Global common stock for $50,000.

ccccc.  On or about July 27, 2004, OFFILL provided Stocker with a signed, blank stock power form for the AVL Global shares.

ddddd.          On or about July 27, 2004, OFFILL signed a written consent on behalf of Collective Thought Holdings authorizing the transfer of the 5,000,000 shares of AVL Global stock it held.

eeeee.  On or about July 27, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the July AVL Global stock issuance.

fffff.   On or about July 28, 2004, Stocker issued an opinion letter opining that the sale of 5,000,000 shares of AVL Global common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

ggggg.     On or about July 28, 2004, Stocker instructed Holladay Stock Transfer Agency to issue a stock certificate to Collective Thought Holdings for 5,000,000 shares of AVL Global common stock without a restrictive trading legend pursuant to Rule 504.

hhhhh.     On or about July 28, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel the stock certificate for Collective Thought Holdings and to reissue the shares to other co-conspirators.

iiiii.     On or about October 5, 2004, OFFILL signed a subscription agreement on behalf of Collective Thought Holdings purporting to memorialize the purchase for investment purposes of 5,000,000 shares of AVL Global common stock for $50,000.

jjjjj.     On or about October 5, 2004, OFFILL provided Stocker with a signed, blank stock power form for the AVL Global shares.

kkkkk.     On or about October 5, 2004, OFFILL signed a written consent on behalf of Collective Thought Holdings authorizing the transfer of the 5,000,000 shares of AVL Global stock it held.

lllll.     On or about October 5, 2004, Stocker issued an opinion letter opining that the sale of 5,000,000 shares of AVL Global common stock complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

mmmmm.     On or about October 5, 2004, Stocker instructed Holladay Stock Transfer Agency to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Collective Thought Holdings for 5,000,000 shares of AVL Global common stock.

nnnnn. On or about October 5, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel the stock certificate for Collective Thought Holdings and to reissue the shares to other co-conspirators.

ooooo. On or about October 5, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the October AVL Global stock issuance.

ppppp. On or about October 26, 2004, a co-conspirator sold approximately 1,000 unregistered shares of AVL Global common stock on the OTC market through Pink Sheets listings.

<u>Custom Designed Compressor Systems</u>

qqqqq. On or about September 2, 2004, OFFILL signed a subscription agreement on behalf of Classical Movement Holdings purporting to memorialize the purchase for investment purposes of 8,250,000 shares of Custom Designed Compressor Systems common stock for $82,500.

rrrrr. On or about September 2, 2004, OFFILL provided Stocker with a signed, blank stock power form for the Custom Designed Compressor Systems shares.

sssss. On or about September 2, 2004, OFFILL signed a written consent on behalf of Classical Movement Holdings authorizing the transfer of the 5,000,000 shares of Custom Designed Compressor Systems stock it held.

ttttt. On or about September 13, 2004, Stocker issued an opinion letter opining that the sale of 8,250,000 shares of Custom Designed Compressor Systems common stock

29

complied with Rule 504 and the shares were exempt from resale restrictions if sold to accredited investors.

uuuuu.  On or about September 13, 2004, Stocker sent OFFILL a check for $2,500 payable to OFFILL's law firm as payment for OFFILL's role in the Custom Design Compressor Systems stock issuance.

vvvvv.  On or about September 21, 2004, Stocker instructed Holladay Stock Transfer Agency to issue a stock certificate without a restrictive trading legend pursuant to Rule 504 to Classical Movement Holdings for 8,250,000 shares of Custom Designed Compressor Systems common stock.

wwwww.  On or about September 21, 2004, Stocker instructed Holladay Stock Transfer Agency to cancel the stock certificate for Classical Movement Holdings and to reissue the shares to Curtis-Case and other co-conspirators.

xxxxx.  On or about September 28, 2004, Stocker caused Curtis-Case to sell approximately 3,600 unregistered shares of Custom Designed Compressor Systems common stock on the OTC market through Pink Sheets listings.

(In violation of Title 18, United States Code, § 371.)

THE GRAND JURY FURTHER CHARGES:

## COUNT TWO - TEN

(Wire Fraud)

1.    Paragraphs 1 through 34 and 36 through 38 are realleged and incorporated by reference as if set forth fully herein.

2.    On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, defendant OFFILL, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice, did knowingly and willfully transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds, including the following:

| Count | Date | From/To | Substance |
|-------|------|---------|-----------|
| 2 | 7/01/04 | Arizona/Reston, VA | Facsimile from Stocker to CC1 with incorporation documents for Emerging Holdings |
| 3 | 7/15/04 | Reston, VA/Florida | Email from CC1 to Luscko transmitting wiring information for $1 million payment to Emerging Holdings' bank account in Reston, VA |
| 4 | 7/20/04 | Florida/Reston, VA | Email from Neu to CC1 with attached draft press release for Emerging Holdings |
| 5 | 7/20/04 | Reston, VA/Florida | Email from CC1 to Neu describing visit to Emerging Holdings by an investigator with the NASD |
| 6 | 7/22/04 | Florida/Reston, VA | Wire re: transfer of $1 million from Neu/Luscko to Emerging Holdings bank account |
| 7 | 7/22/04 | Reston, VA/Arizona | Email from CC1 to Stocker asking what needs to be done about the inquiries by the Virginia State Corporation Commission |

31

| 8 | 7/22/04 | Florida/Reston, VA | Facsimile from Neu/Luscko to CC1 with, among other items, promissory note dated June 11, 2004 |
| 9 | 7/23/04 | Reston, VA/Florida | Facsimile from CC1 to Neu/Luscko with, among other items, letter re: satisfaction of financial obligations pursuant to promissory note of June 11, 2004 |
| 10 | 8/06/04 | Arizona/Reston, VA | Facsimile from Stocker to Danny Taylor of the Virginia State Corporation Commission, Division of Securities and Retail Franchising, containing, among other items, the opinion letter and subscription agreement for the Emerging Holdings stock issuance |

(In violation of Title 18, United States Code, Sections 1343 and 2.)

THE GRAND JURY FURTHER CHARGES:

<u>Forfeiture Notice</u>

Pursuant to Rule 32.2(a), the defendant is hereby notified that, if convicted of either the conspiracy charge in Count One or the wire fraud charges in Counts Two through Ten of this Indictment, defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud, in violation of Title 18, United States Code, Section 1343, and securities fraud, in violation of Title 15, United States Code, Section 78ff, including a sum of money equal to at least $15,812,280 in United States currency, representing the amount of proceeds obtained as a result of the conspiracy charged in Count One, for which the defendant is jointly and severally liable.

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the value of the amount described, i.e., $15,812,280 in United States currency, if, by any act or omission of the defendant, the $15,812,280 in United States currency or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty. The property subject to forfeiture as substitute assets includes, but is not limited to, the following:

**A. Vehicles:**

      (1) 2001 Harley-Davidson Motorcycle, VIN: 1hd1gdv161y332048; and

(2)  1972 Porsche 911, VIN: 9111310535.

**B. Bank Accounts:**

(1)  Citibank account with the following names and account numbers: Crimson City Holdings, Inc account number 335029329; Odyssey Contracting, LLC, account number 333104848; Phillip W. Offill, d/b/a MMA Investments, account number 9770837083; Phillip W. Offill, Jr. Attorney At Law, account number 9771835110;

(2)  Citigold checking account in the name of Phillip W. Offill, account number 9784794387;

(3)  Chase account in the name of Phillip W. Offill, account number 641385182;

(4)  Southwest Texas Capital, checking account in the name of Phillip W. Offill, account number SWT-000949;

(5)  T. Rowe Price investment account in the name of Phillip W. Offill, Jr., and Jessica L Offill, account number 5001050307-1;

(6)  Merrill Lynch brokerage account in the name of Odyssey Contracting, account number 54202054;

(7)  Banc One checking account in the name of Phillip W. Offill, account number 541385182;

(8)  Fort Worth Community Credit Union checking account in the name of Phillip W Offill, Jr. account number 311300;

(9)  Noble Trading brokerage account in the name of Crimson City Holdings, Inc. account number 1811610 and 18510719;

(10)  Burt Martin Arnold Securities brokerage account in the name of Crimson City Holdings, Inc. account number 61308289;

(11)  First Southwest Company in the name of Phillip W Offill, Jr. account number 60669531; and

(12)  First London Securities Odyssey Contracting, LLC, account number 60403353.

(Pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461, and 21 U.S.C. § 853.)

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____

FOREMAN OF THE GRAND JURY

DATE: _____, 2009

DANA J. BOENTE
Acting United States Attorney

Patrick F. Stokes
Assistant United States Attorney

Edmund P. Power
Assistant United States Attorney

STEVEN A. TYRRELL
Chief, Fraud Section
Criminal Division
U.S. Department Of Justice

Steve A. Linick
Deputy Chief